Argued and submitted July 16, reversed August 28, 2002

In the Matter of Diana Roberts,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

DIANA ROBERTS,
*Appellant.*

0105-66039; A114854

52 P3d 1123

Laurie Bender argued the cause and filed the brief for appellant.

Kyle J. Martin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

The trial court found appellant to be a danger to herself because of mental illness and committed her to the Mental Health Division for a period not to exceed 180 days. She appeals. We review *de novo, State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976), and reverse.

Appellant, 56 years old at the time of her hearing, lives with her husband in Portland. He adequately supports her, and she apparently functions successfully as a homemaker. As she concedes, however, she suffers from a bipolar schizoaffective disorder that leads her, when she is not on her medication, to wander the streets in a confused state of mind. Before the incident that led to her commitment, she had been detained on a "mental health hold," ORS 426.070(5), four times, most recently two weeks earlier.

On the occasion of the detention in this case, the record does not disclose, and no witness could recall or determine, any details of how or why she had come to the attention of authorities. The record reveals only that on May 15, 2001, she was involuntarily hospitalized because, according to the "notification of mental illness," ORS 426.070(2), she was "wandering—confused—disorganized." When Robert Skall, a mental health investigator, tried to interview her, she acted "paranoid and delusional," "loud and hypo-manic." His report noted a long history of mental illness and hospitalizations, as well as a pattern of not taking her medications and "putting herself in harm's way." He concluded that "she is unable to care for her basic personal [*sic*] and is dangerous to herself and others." Except to repeat that she was "found wandering, confused and disorganized in her thinking," the report, submitted to the court pursuant to ORS 426.074, did not describe any incidents in which she had, in fact, put herself in harm's way or acted so as to be dangerous to anybody.

In preparation for a hearing on May 29, 2001, two mental health professionals examined appellant and submitted reports to the court. One wrote that appellant's "manic behavior places her at risk of initiating a dangerous situation through wandering," that she was "at risk of angering others," and that she was "at high risk of dangerous behavior

wandering in the streets." The other wrote that she was "likely to place herself in harm's way," without details. Both examiners relied heavily on the report from Skall, the investigator.

At the May 29 hearing, appellant and Skall were questioned by both examiners, the court, and appellant's counsel. The following dialogue between Skall and appellant's counsel includes the only information in the record referring with any specificity to actual incidents that might be considered dangerous:

"MR. WEST [Appellant's Counsel]:   Okay. And you said you believe if she is discharged, she would come into harm's way. And yet, as I recall, you didn't give any particular examples of that happening in the past, particularly this incident that brought her here today.

"THE WITNESS [Mr. Skall]:   Well, she always allegedly wanders into traffic, she's disorganized, she's not able to—she's so preoccupied, for the most part, and moving in every direction, that she oftentimes when she is brought in by the police, it's because she's yelling loudly in the streets, she's scaring people, she's stepping off the curb into traffic, she is doing things that are very erratic.

"MR. WEST:   But you said you didn't have any information—if I heard correctly, and please correct me if I'm wrong—you didn't have any information in terms of what brought her into the hospital this time.

"THE WITNESS:   On this hold, the only thing I know, as much as you guys, what is basically on the notice and what she's told me because there were no police reports.

"MR. WEST:   So the information you were giving a moment ago was based on one or two years ago, possibly, or longer.

"THE WITNESS:   Based on history, yes."

Based on the reports, the testimony and its own observations, the trial court concluded that appellant was a danger to herself. Acknowledging that "the Court does not have good evidence regarding incidents which have resulted in danger to herself," the court found that appellant's "condition remains at such a level that if she were released today, she would be

so confused that she would be unable to navigate the streets—although she does do that—that her confusion has reached a level that it would be dangerous to herself and that there would be immediate danger to herself if released on the streets."

■    A person may be committed to involuntary confinement in a mental institution if the person is found to be "mentally ill." ORS 426.130(1)(b)(C). As relevant to this case, a mentally ill person is one "who, because of a mental disorder, is * * * [d]angerous to self or others." ORS 426.005(1)(d)(A). Confinement requires proof by clear and convincing evidence, ORS 426.130(1)(b)(C), which, in the context of an involuntary commitment hearing, is "evidence that is of extraordinary persuasiveness." *State v. Simon*, 180 Or App 255, 263, 42 P3d 374 (2002); *State v. Johnson*, 131 Or App 561, 564, 886 P2d 42 (1994). Put another way, "[c]lear and convincing evidence is evidence that makes the fact in issue highly probable." *State v. King*, 177 Or App 373, 377, 34 P3d 739 (2001).

■    Whether the evidence in any case is sufficient must be decided on its own facts; fact-matching is not helpful. *State v. Jayne*, 174 Or App 74, 82, 23 P3d 990, *rev den* 332 Or 316 (2001). Still, some principles emerge from the many opinions in this area. We have held that a person can be deemed dangerous to self if he or she has established a pattern in the past of taking certain actions that lead to self-destructive conduct, and then he or she begins to follow the pattern again. In such circumstances, the state "need not postpone action until the individual is on the brink of death. The goal of the commitment statute is safe survival, not merely the avoidance of immediate death." *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992) (regarding the finding that a person is unable to provide for basic personal needs); *accord State v. Brungard*, 101 Or App 67, 789 P2d 683, *mod on recons* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991) (dangerousness to self). On the other hand, we have recognized that a mere "speculative threat * * * is not by itself sufficient." *Bunting*, 112 Or App at 145. We have stated that "[a]pprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment." *State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999).

■     In this case, appellant was committed to the Mental Health Division—by which we mean she was confined, over her express protest—based on her dangerousness to herself as demonstrated solely and entirely by (1) her past pattern of not taking prescribed medications, and (2) an unrebutted hearsay report that she had "step[ped] off the curb" some unspecified number of times at some unspecified times in the past. The report does not describe facts indicating peril; it does not describe facts at all. Indeed, it is a report of a report of something that "allegedly" happened. Further, although appellant evidently wanders the streets frequently, the record contains no indication that this activity has ever led to injury. Thus, this case does not present a situation in which authorities interrupted a sequence of events that has, in the past, led to disaster. We understand that "predicting human behavior is an inherently speculative endeavor," *Simon*, 180 Or App at 263, but nonetheless, on the record before us, we do not find "extraordinar[ily] persuasive[ ]" evidence that appellant will wander into traffic and injure herself. *Id.* at 255. That event, on this extremely meager record—a record that does not even disclose how appellant came to the attention of authorities—is not "highly probable." *See King*, 177 Or App at 377.

Reversed.